UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

THERON HUNTER,                          Case No. 20-10534

          Plaintiff,                Nancy G. Edmunds
v.                                      United States District Judge

KATHLEEN HOLMES, *et al.*,              Curtis Ivy, Jr.
                                        United States Magistrate Judge
          Defendants.
_____/

**REPORT AND RECOMMENDATION ON WASHTENAW DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT (ECF No. 156); SCREENING
PLAINTIFF'S AMENDED COMPLAINT.**

Plaintiff filed this lawsuit without the assistance of counsel on February 28,

2020.  (ECF No. 1).  This matter was referred to the undersigned for all pretrial

matters.  (ECF No. 10).  This matter is presently before the Court regarding the

Washtenaw Defendants'[1] motion for summary judgment and for screening.  (ECF

No. 156).  Plaintiff was given an extension of time to file exhibits in response to

the motion, which he did.  (ECF No. 211).  For the following reasons, the

undersigned recommends the Court **GRANT** the motion and **DISMISS** all other

remaining claims against the Washtenaw Defendants pursuant to screening.

---

[1] Defendants Williams, Casey, Schiappacasse, Clayton, and Alvarez are the Washtenaw
Defendants.  (ECF No. 156, PageID.2731).

1

## I.      Standard for Summary Judgment

Summary judgment is mandated "after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to the party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  A motion for summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A fact is material if it might affect the outcome under governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  When evaluating a motion for summary judgment, the Court "views the evidence, all facts, and any inferences that may be drawn from the facts in the light most favorable to the nonmoving party." *Pure Tech Sys., Inc. v. Mt. Hawley Ins. Co.*, 95 F. App'x 132, 135 (6th Cir. 2004).

"The moving party has the initial burden of proving that no genuine issue of material fact exists. . . ." *Stansberry v. Air Wis. Airlines Corp.*, 651 F.3d 482, 486 (6th Cir. 2011) (internal quotations omitted); *cf.* Fed. R. Civ. P. 56(e)(2) (providing if a party "fails to properly address another party's assertion of fact," then the court may "consider the fact undisputed for purposes of the motion").  "Once the moving party satisfies its burden, 'the burden shifts to the nonmoving party to set forth specific facts showing a triable issue.'" *Wrench LLC v. Taco Bell Corp.*, 256 F.3d

446, 453 (6th Cir. 2001) (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).  The nonmoving party must "make an affirmative showing with proper evidence in order to defeat the motion." *Alexander v. CareSource*, 576 F.3d 551, 558 (6th Cir. 2009); *see also Lee v. Metro. Gov't of Nashville & Davidson Cty.*, 432 F. App'x 435, 441 (6th Cir. 2011) ("The nonmovant must, however, do more than simply show that there is some metaphysical doubt as to the material facts, there must be evidence upon which a reasonable jury could return a verdict in favor of the non-moving party to create a genuine dispute.") (internal quotation marks and citation omitted).  In other words, summary judgment is appropriate when "a motion for summary judgment is properly made and supported and the nonmoving party fails to respond with a showing sufficient to establish an essential element of its case. . . ." *Stansberry*, 651 F.3d at 486 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986)).

That Plaintiff is *pro se* does not reduce his obligations under Rule 56.  Rather, "liberal treatment of *pro se* pleadings does not require lenient treatment of substantive law."  *Durante v. Fairlane Town Ctr.*, 201 F. App'x 338, 344 (6th Cir. 2006).  In addition, "[o]nce a case has progressed to the summary judgment stage, . . . 'the liberal pleading standards under *Swierkiewicz* [*v. Sorema, N.A.*, 534 U.S. 506, 512-13 (2002)] and [the Federal Rules] are inapplicable.'" *Tucker v. Union of Needletrades, Indus. & Textile Emps.*, 407 F.3d 784, 788 (6th

3

Cir. 2005) (quoting *Gilmour v. Gates, McDonald & Co.*, 382 F.3d 1312, 1315 (11th Cir. 2004)).  The Sixth Circuit has made clear that, when opposing summary judgment, a party cannot rely on allegations or denials in unsworn filings and that a party's "status as a *pro se* litigant does not alter [this] duty on a summary judgment motion." *Viergutz v. Lucent Techs., Inc.*, 375 F. App'x 482, 485 (6th Cir. 2010); *see also United States v. Brown*, 7 F. App'x 353, 354 (6th Cir. 2001) (affirming grant of summary judgment against a *pro se* plaintiff because he "failed to present any evidence to defeat the government's motion").

## II.    Factual Background

Plaintiff's verified complaint raises claims under the Eighth Amendment, medical malpractice, negligence, gross negligence, and intentional infliction of emotional distress related to alleged failure to treat an elbow injury.  (ECF No. 42). Plaintiff also brings a *Monell* claim.  (*Id.*).

Plaintiff was injured on March 22, 2018, while at the Washtenaw County Jail.  (ECF No. 42, PageID.362).  He alleges that he was on the basketball court and while he was bent over to pick up the ball, another inmate "jumped on my back and bear hugged me" causing Plaintiff to fall and bang his elbow on the concrete.  (*Id.*).

Plaintiff was seen by a nurse around two or three hours after he was injured. (*Id.* at PageID.363).  She cleaned Plaintiff's arm and examined the injury,

concluding she did not believe it was broken just badly scraped.  (*Id.*).  On March 23, 2018, at around 10 pm, Plaintiff alleges his elbow and forearm muscles started to hurt badly from the injury.  On March 24, 2018, he put in a kite[2] for medication and he alleges his "arm was locked in a 90 [degree] angle and hurt very bad." Plaintiff alleges that during the evening of March 24, 2018, he was denied ibuprofen by Defendant Nurse "Rocky" Iseley because he did not put a medication slip into the box outside the cell block, a procedure which Plaintiff asserts is not posted anywhere nor in the jail rule book.  (*Id.* at PageID.364).  Plaintiff alleges he showed Defendant Iseley that his arm was locked in a 90 degree angle and was now "swollen twice the size of the other arm[.]"  (*Id.*).

Plaintiff submitted another kite on March 25, 2018.  (*Id.*).  Plaintiff alleges Defendant Kathleen Holmes was aware of his injury because he stated his injury in this kite and she saw his condition on March 26, 2018, but she did not schedule an appointment for Plaintiff to see the doctor.  (*Id.*).  Plaintiff alleges that on March 26, 2018, that he asked an unknown nurse about his arm and told her he was becoming worried because his arm was not improving.  (*Id.* at PageID.365).  The nurse prescribed Plaintiff ibuprofen and put in a note for Plaintiff to see the nurse practitioner.  (*Id.*) (asserting the nurse "put [Plaintiff] on to see the nurse

---

[2] A "kite" is a form that allows inmates to communicate and get information about "just about anything," including court dates, visitors, lawyers' information, requests, complaints, or medical assistance. *See, e.g.*, *Meirs v. Ottawa Cnty.*, 821 F. App'x 445, 448 (6th Cir. 2020).

practitioner[.]").  During the evening medication distribution, Plaintiff alleges

when he asked a nurse about his ibuprofen that Defendant Kathleen Holmes

confronted Plaintiff about his grievance, was unconcerned about Plaintiff's injury,

and told Plaintiff that neither a doctor nor a nurse practitioner would be in that

week.  (*Id.*).

Plaintiff was seen by Defendant Doctor Darryl Parker on March 27, 2018.

(*Id.* at PageID.366).  Defendant Parker ordered an X-ray and shared he would

follow up once the X-ray results came back, "a couple nights at most."  (*Id.*).

Plaintiff alleges that his ibuprofen was only ordered for five days, ending on March

31, 2018.  (*Id.*).  Plaintiff alleges that the injury was not effectively treated with

ibuprofen and Plaintiff's arm was still swollen and locked.  (*Id.*).  On April 4,

2018, and April 9, 2018, Plaintiff submitted kites because he had not yet received

his X-ray results.  (*Id.* at PageID.366-67).

On April 10, 2018, Plaintiff received a kite from medical that conveyed the

X-ray results came back normal and the ibuprofen was restarted.  (*Id.* at

PageID.368).  On April 11, 2018, a nurse examining Plaintiff wrote "R+arm

muscle/tendon issue MD list" on the medical kite from April 10, 2018.  (*Id.*).  On

April 11, 2018, or April 12, 2018, Defendant Parker examined Plaintiff.  (*Id.*).

Parker told Plaintiff that stretching was the only thing that would help Plaintiff's

arm.  (*Id.*).  Plaintiff asked about steroids, because Plaintiff alleges steroids are

good for swelling. (*Id.*). Parker told Plaintiff that ibuprofen is better for swelling than steroids and switched Plaintiff's prescription to ibuprofen twice a day and naproxen twice a day. (*Id.*). Plaintiff also asked about getting an MRI or a CAT scan. (*Id.* at PageID.369). Parker allegedly told Plaintiff further imaging was not needed because the X-ray came back normal. (*Id.*). Plaintiff alleges Parker told him an X-ray would "pick up on muscle tears, and tendon and ligament problems and injuries. Which to Plaintiff's knowledge is a lie." (*Id.*).

Plaintiff alleges that "through seeking further medical care" that his X-ray showed "fragments" in his elbow which were most likely "small pieces of bone up to 6 millimeters big scattered through Plaintiff's elbow." (*Id.*). Plaintiff was later seen by a doctor at the University of Michigan, about six months after Plaintiff was injured. (*Id.* at PageID.371). That doctor allegedly told Plaintiff "he believed this condition will be permanent that there is little chance my arm would return [to normal] from physical therapy, and he. . . didn't think surgery would help." (*Id.*).

On April 20, 2018, Plaintiff was told to be patient and he would be scheduled for a physical therapy session to teach him the proper stretches to continue to heal his arm. (*Id.*). Plaintiff alleges that Defendant Williams oversaw the "Washtenaw County Jail medical department/John Doe private medical corporation." (*Id.* at PageID.372). Plaintiff alleges part of Williams' job is to intercede when the Washtenaw County Jail's medical department is not giving

adequate medical care to prisoners.  (*Id.* at PageID.373).

Plaintiff alleges that on May 6, 2018, and May 10, 2018, he turned in kites asking about physical therapy.  (*Id.* at PageID.374).  Plaintiff was told that he could not be told the date of his physical therapy for "security reasons" but that Plaintiff could rest assured that the appointment had been scheduled.  (*Id.*).[3]

On June 26, 2018, Plaintiff sent a medical kite notifying the medical department of potential risks involved in continuing to delay proper medical treatment for his arm including allegedly permanent disfigurement and pain.  (*Id.* at PageID.378).  The same day, Plaintiff sent a kite to Defendant Casey seeking clarification as to what further administrative steps Plaintiff could take to receive proper medical care.  (*Id.* at PageID.378-79).  Plaintiff alleges this kite was never responded to.

Plaintiff alleges that Defendant Holmes is the head of the medical department, and he sent her a kite on July 5, 2018, in which he indicated that the treatment Plaintiff was receiving was ridiculous and Plaintiff was still in lots of

---

[3] The undersigned notes that Plaintiff briefly includes some factual allegations that are unrelated to his arm.  These facts do not seem related to any of Plaintiff's claims, but the undersigned includes them here in the interest of completeness.  Plaintiff alleges that on June 3, 2018, he turned in a medical kite because his sides were hurting, and blood leaked out of his penis.  (ECF No. 42, PageID.374-75).  Plaintiff alleges that the front of his boxers was "almost completely covered" in blood and that he did not have any cuts.  (*Id.* at PageID.375).  Plaintiff alleges various nurses were unconcerned with his condition.  (*Id.*).  On June 5, 2018, Plaintiff was seen by medical staff and Plaintiff declined to give a urine sample "because he no longer wanted to be seen for his penis, since it had been two days since the incident on 6/3/18, and his sides no longer hurt, and no more blood had leaked out his penis."  (*Id.* at PageID.376).

pain and had not received physical therapy.  (*Id.* at PageID.379).

Plaintiff alleges that on July 8, 2018, he was instructed by the unit officer that non-party Sergeant Clifton wanted Plaintiff to write him a kite explaining everything that was going on with Plaintiff and his medical care.  (*Id.* at PageID.390).  Plaintiff asserts that this was a "charade" orchestrated by Defendant Alverez because Alverez had denied Plaintiff's kites the day prior and denied Plaintiff's mother's request to talk to the Sheriff.  (*Id.*at PageID.391).  Plaintiff alleges he believes Defendant Schiappacasse "was in on this as well" because Defendant Holmes consistently mentioned Schiappacasse when Plaintiff and Holmes spoke on July 10, 2018.  (*Id.*).

Plaintiff alleges he and Defendant Holmes spoke on July 10, 2018, related to his July 5, 2018, kite.  Plaintiff alleges Defendant Holmes explained that Defendant Shiappacasse took over for Defendant Williams overseeing the medical department.  (*Id.* at PageID.381).  That same day Holmes allegedly told Plaintiff the delay in physical therapy had been way too long and she would expedite the appointment.  (*Id.* at PageID.383).  Plaintiff alleges this was a lie and he was already scheduled for an appointment on July 12, 2018.  (*Id.*).  Holmes also allegedly said she would consult with "CO/Lt for injury reports" and Plaintiff alleges this response "clearly shows Lieutenants Shiappacasse, and Lieutenant Williams role when it comes to the medical department."  (*Id.* at PageID.384).

9

On July 12, 2018, Plaintiff alleges he was taken to physical therapy, but Plaintiff asserts the therapist was "the wrong physical therapist." (*Id.* at PageID.386). Plaintiff alleges the physical therapist he saw specialized in backs, not in arms or the injury that Plaintiff suffered. (*Id.* at PageID.387). The physical therapist recommended a hot compress on his arm and, upon further questioning from Plaintiff, stated that ice would be a second option if no hot compress was available. (*Id.*). On July 14, 2018, Plaintiff sent a kite stating "he went to physical therapy on 7/12/18 and the therapist wanted him to ice his elbow twice a day for 30 min." (*Id.*). Plaintiff alleges he was told by a nurse that the medical department did not have hot packs, but that this was a lie because when he received a cold pack on July 16, 2018, that it was a cold and hot reusable, microwavable compress. (*Id.*). Plaintiff alleges that many days he was not brought any ice packs or if he did receive ice packs that the pack was only cold for five minutes. (*Id.* at PageID.396-405).

Plaintiff alleges that "something was popping out of his arm" while he did his physical therapy exercises and he was uncertain if he should continue his physical therapy exercises as a result of pain after he finished them. (*Id.* at PageID.388). The medical department instructed Plaintiff to speak with his physical therapist on July 25, 2018. (*Id.*). On July 18, 2018, Plaintiff met with Defendant Holmes in medical. (*Id.*at PageID.395). Holmes brought Plaintiff a

large completely frozen ice pack from home because Plaintiff complained the cold compresses from the medical department were not sufficiently cold. (*Id.*). Holmes allegedly told Plaintiff he had arthritis in his elbow from old age, but Plaintiff alleges Holmes failed to tell Plaintiff of the "scattered loose bodies" in his elbow and was using old age to try to convince Plaintiff that medical "did right by him." (*Id.* at PageID.393-96). Plaintiff also asked Holmes about the possibility of hot compresses, but Holmes stated that Washtenaw County Jail does not do hot compresses. (*Id.* at PageID.396). Holmes also allegedly said that ice is best for inflammation. (*Id.*).

Plaintiff alleges that he spoke with Defendant Alverez several times between May 6, 2018, and June 26, 2018, about the medical care that Plaintiff was receiving. (*Id.* at PageID.408). Defendant Alverez told Plaintiff that he would "look into it and talk to medical." (*Id.*). Plaintiff alleges that he spoke with Defendant Schiappacasse several times during that same window. (*Id.* at PageID.409). Schiappacasse allegedly told Plaintiff he would look into it and talk to medical, but Plaintiff alleges nothing happened. (*Id.*). Plaintiff alleges that his mother called the Washtenaw County Jail and, after she left a few messages with Sherriff Clayton with no response, she was transferred to talk to Defendant Alverez instead. (*Id.* at PageID.418). Alverez allegedly explained that he was better equipped to handle Plaintiff's problems than the Sheriff and that he would handle

11

it, but Plaintiff alleges he did nothing. (*Id.*). This occurred around June 20, 2018, to July 1, 2018, Plaintiff does not know the exact date. (*Id.*).

On August 15, 2018, Plaintiff was released from the Washtenaw County Jail into the custody of the Van Buren Police Department and subsequently bonded out on August 16, 2018. (*Id.* at PageID.405). After Plaintiff was released, he saw various medical providers of his own accord. He alleges Washtenaw County Jail and Defendant Corizon would not release his medical records from his time in Washtenaw County Jail. (*Id.* at PageID.410-14).

## III.    Analysis on Defendants' Motion for Summary Judgment

As mentioned, Plaintiff was given an extension of time, to August 10, 2023, to file exhibits in response to the motion for summary judgment. On August 15, 2023, those exhibits were filed. (ECF No. 211). In the affidavit provided with the exhibits, Plaintiff asserts that there are sets of documents he never received in discovery, and without those documents he could not fully respond to the motion. That is an issue that should have been raised in a motion to compel during the discovery period, not in an affidavit after the close of the dispositive motion deadline. The failure to assert his position during discovery waives the issue of whether discovery responses were complete. Next, the exhibits are over 300 pages of documents. Many of these documents appear related to the Wellpath defendants, including his response brief to their motion for summary judgment, not

the Washtenaw defendants.  But more troubling is the lack of discussion as to how each exhibit creates a genuine issue of material fact or otherwise supports Plaintiff's position in opposition to the Washtenaw Defendants' motion.  The Court cannot be expected to comb through over 300 pages of documents to find support for Plaintiff.  In short, the exhibits do not impact this analysis.

On February 14, 2023, Defendants Alvarez, Schiappacasse, Casey, Williams, and Clayton moved for summary judgment.  (ECF No. 156).

Plaintiff brings a claim of deliberate indifference under the Eighth Amendment against Defendants Alverez, Casey, Clayton, Schiappacasse, and Williams, among others.  (ECF No. 42, PageID.433, PageID.464-70).  Plaintiff also asserts a failure-to-protect claim under the Eighth Amendment against Defendants Clayton, Casey, Williams, Schiappacasse, Alverez.  (*Id.* at PageID.436, PageID.438-42) (failure to protect the Plaintiff from a deliberate indifference to his serious medical need).  Plaintiff also appears to bring a *Monell* claim against the Washtenaw Defendants.  (*Id.* at PageID.356).  Plaintiff also seeks to bring Michigan state tort claims for medical malpractice, negligence, gross negligence, intentional infliction of emotional distress, and '*respondeat superior*.'  (*Id.* at PageID.434).  The Court shall address each of these claims in turn.

The undersigned suggest that the Defendants were not deliberately indifferent.  The Eighth Amendment prohibits "cruel and unusual punishment"

against individuals convicted of crimes.[4]  "The Eighth Amendment is violated when an official is deliberately indifferent to the serious medical needs of a prisoner in their care."  *Jones v. Cnty. of Kent*, 601 F. Supp. 3d 221, 243 (W.D. Mich. Apr. 29, 2022) (citations omitted).  Because the "Eighth Amendment prohibition against cruel and unusual punishments applies to the [S]tates through the Fourteenth Amendment, . . . prisoners may sue [S]tate prison authorities for Eighth Amendment violations."  *Rhinehart v. Scutt*, 894, F.3d 721, 735 n.12 (6th Cir. 2018) (citing *Robinson v. California*, 370 U.S. 660, 667 (1962)).

"A claim for the deprivation of adequate medical care has an objective and a subjective component."  *Jones*, 601 F. Supp. 3d at 243 (citing *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)).  For "the objective component, the plaintiff must establish that the medical need at issue is sufficiently serious."  *Id.*  (citing *Farmer*, 511 U.S. at 834).  A prisoner can establish that he has a serious medical need if "a doctor has diagnosed a condition as requiring treatment or [ ] the prisoner has an obvious problem that any layperson would agree necessitates care."  *Phillips v. Tangilag*, 14 F.4th 524, 534 (6th Cir. 2021) (citation omitted).  "Only if a prisoner proves this objective element must courts consider the second (subjective) part of

---

[4] The undersigned presumes Plaintiff is a prisoner and his claims are governed by the Eighth Amendment because n party suggests that Plaintiff is a pretrial detainee, which would mean the Fourteenth Amendment governs his claims.  The Eighth and Fourteenth Amendment deliberate indifference standards are largely the same except the subjective component is modified in cases brought by pretrial detainees.  *Brawner v. Scott Cnty., Tenn.*, 14 F.4th 585 (6th Cir. 2021).

14

the deliberate-indifference test." *Id.* at 535.

"[I]f doctors effectively provide no care for [a serious medical need]," then the objective element is satisfied. *Id.* at 534 (citation omitted). But "[m]ore frequently, doctors provide some care and prisoners challenge their treatment choices as inadequate. To establish the objective element in this common situation, prisoners must show more." *Id.* at 534–35 (citations omitted). That is, the care must be "so grossly incompetent or so grossly inadequate as to shock the conscience or be intolerable to fundamental fairness." *Id.* at 535 (internal quotation marks and quotation omitted). "[T]o prove grossly inadequate care, . . . courts generally require [prisoners] to introduce medical evidence, typically in the form of expert testimony." *Id.* (citations omitted). And "mere malpractice does not violate the Eighth Amendment. *Id.* (citing *Estelle v. Gamble*, 429 U.S. 97, 106 (1976)).

Here, it is clear to the undersigned that some level of care was provided to the Plaintiff. Plaintiff was seen by a nurse around two or three hours after he was injured. (ECF No. 42, PageID.363). Plaintiff was later seen by Defendant Doctor Darryl Parker and an X-ray was ordered to assess his injury. (*Id.* at PageID.366). Plaintiff was prescribed medication to manage his pain and to reduce the swelling in his arm, provided ice packs, and received physical therapy. Plaintiff's allegations that he was prescribed medication and received physical therapy are

corroborated by Plaintiff's treatment records.  (ECF No. 156-4, PageID.2778).

While Plaintiff disputes the adequacy of this treatment plan and the speed of the

treatment, it is not the case that doctors effectively provided no care for a serious

medical need.  And MRI results from the University of Michigan Medical

Department notes that although "IA bodies are present, the size [of the IA bodies]

are unlikely to cause the range of motion limitation [Plaintiff] is experiencing" and

recommends continuing with the current treatment plan.  (ECF No. 156-4,

PageID.2783).  The provider observed "[l]ikely resolved strain of the distal bicep

tendon or potentially even resolving bursitis from forced over stretching."  (*Id.* at

PageID.2784).  That assessment also notes Plaintiff "continues to believe that [his

injury] is preventing him [from] being functional despite having a function arc of

at least 140 degrees with basically full supination and pronation."  (*Id.*).

    In order to succeed on his claim, Plaintiff must prove the care he received

was grossly inadequate, which necessitates expert testimony.  *Phillips*, 14 F.4th at

536 ("[Plaintiff] needed to present expert medical evidence describing what a

competent doctor would have done and why the chosen course was not just

incompetent but grossly so.").  Here there is no evidence about what a competent

doctor would have done and at the summary judgment stage the absence of such

evidence is fatal to Plaintiff's claim.

    In his response brief, Plaintiff cites *Comstock v. McCrary* to argue that a

16

doctor may not avoid liability for deliberate indifference simply because he or she provided some medical attention.  (ECF No. 190, PageID.3402) (citing *Comstock v. McCrary*, 273 F.3d 693, 708, n.5 (6th Cir. 2001)).  The plaintiff in *Comstock* supported his argument that the defendant was deliberately indifferent to his serious medical needs with three expert opinions describing the appropriate standard of care.  *Comstock*, 273 F.3d at 708.  While a defendant may not avoid liability for deliberate indifference by providing some medical care, a plaintiff must present expert medical evidence demonstrating why the chosen course was grossly incompetent.  Plaintiff's arguments in response detail the various ways in which he feels the care he received was in adequate, but Plaintiff presents no expert evidence related to the standard of care.  Plaintiff has not demonstrated that the care he received was grossly inadequate and the undersigned suggests summary judgment is appropriate against the Washtenaw Defendants on the deliberate indifference claim.

As to Plaintiff's claim of failure-to-protect by the Washtenaw Defendants, The Defendants failed to address Plaintiff's failure-to-protect-from-deliberate-indifference claim in their motion for summary judgment.  This claim is addressed substantively later in this report, where the undersigned recommends this claim be dismissed pursuant to screening Plaintiff's complaint.

As to Plaintiff's asserted *Monell* claims, the undersigned notes Plaintiff does not name the Washtenaw County Sherriff's Department but names individual members of the Washtenaw County Sherriff's Department in their individual and official capacities. *Monell* imposes liability on municipalities, not individuals. *Phillips v. City of Cincinnati*, 2019 WL 2289277, at *6 (S.D. Ohio May 29, 2019); *Shorts v. Bartholomew*, 255 F. App'x 46, 57 (6th Cir. 2007) ("official-capacity suits generally represent only another way of pleading an action against an entity of which an officer is an agent. Suits against [local government] officials in their official capacity therefore should be treated as suits against the [local government]."). *Monell* claims against individuals in their official capacities are construed as claims against the municipality. Here, that might be Washtenaw County. The Court need not make a determination as to whether the Defendants are liable under *Monell* because there "can be no liability under *Monell* without an underlying constitutional violation." *Robertson v. Lucas*, 753 F.3d 606, 622 (6th Cir. 2014) (citing *see Scott v. Clay Cnty., Tenn.,* 205 F.3d 867, 879 (6th Cir. 2000)). As the undersigned has suggested that there is no underlying constitutional violation by the Washtenaw Defendants here, the undersigned suggests granting the motion for summary judgment on the *Monell* claim is appropriate because there is no underlying constitutional violation upon which the claim may rest.

As to Plaintiff's state-law claims for medical malpractice, negligence, gross

negligence, intentional infliction of emotional distress, and '*respondeat superior*,' the undersigned suggests the Court decline supplemental jurisdiction on these claims because all the federal claims would be dismissed. (ECF No 42, PageID.434). Under 28 U.S.C. § 1367, a district judge may decline to exercise supplemental jurisdiction over state-law claims if "the district court has dismissed all claims over which it has original jurisdiction. . . ." 28 U.S.C. § 1367(c)(3). "When all federal claims are dismissed before trial, the balance of considerations usually will point to dismissing the state law claims [.]" *Musson Theatrical, Inc. v. Express Corp.*, 89 F.3d 1244, 1254-55 (6th Cir. 1996). Indeed, the Sixth Circuit has repeatedly advised that the district courts should not exercise supplemental jurisdiction over state-law claims where all original jurisdiction claims have been dismissed. *See*, *e.g.*, *Brown v. Cassens Transp. Co.*, 546 F.3d 347, 363 (6th Cir. 2008). The undersigned recommends Plaintiff's state-law claims against the Washtenaw Defendants be dismissed without prejudice.

## IV. Screening Standard

As noted earlier, Plaintiff appears to bring a failure-to-protect claim against the Washtenaw Defendants and the Defendants do not address this claim against them in their motion for summary judgment. The Court shall screen the complaint pursuant to 28 U.S.C. § 1915 and 42 U.S.C. § 1997e regarding the failure-to-protect claim against the Washtenaw Defendants.

When a plaintiff is proceeding *in forma pauperis*, "the court shall dismiss the case at any time if the court determines that . . . the action or appeal . . . fails to state a claim on which relief may be granted." 28 U.S.C. § 1915(e)(2)(B)(ii); *see also* 42 U.S.C. § 1997e(c). The dismissal standard of Federal Rule of Civil Procedure 12(b)(6) described in *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007), governs failure to state a claim under § 1997e(c). *Hill v. Lappin*, 630 F.3d 468, 470-71 (6th Cir. 2010). "[A] complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation omitted); *see also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (concluding that a plausible claim need not contain "detailed factual allegations," but it must contain more than "labels and conclusions" or "a formulaic recitation of the elements of a cause of action"). Facial plausibility is established "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. "The plausibility of an inference depends on a host of considerations, including common sense and the strength of competing explanations for the defendant's conduct." *16630 Southfield Ltd., P'Ship v. Flagstar Bank, F.S.B.*, 727 F.3d 502, 503 (6th Cir. 2013).

The Court holds *pro se* complaints to "less stringent standards than formal pleadings drafted by lawyers." *Haines v. Kerner*, 404 U.S. 519, 520 (1972). That

20

said, even in pleadings drafted by *pro se* parties, "'courts should not have to guess at the nature of the claim asserted.'" *Frengler v. Gen. Motors*, 482 F. App'x 975, 976-77 (6th Cir. 2012) (quoting *Wells v. Brown*, 891 F.2d 591, 594 (6th Cir. 1989)). "[C]ourts may not rewrite a complaint to include claims that were never presented . . . nor may courts construct the Plaintiff's legal arguments for him. Neither may the Court 'conjure up unpled allegations[.]'" *Rogers v. Detroit Police Dep't*, 595 F. Supp. 2d 757, 766 (E.D. Mich. 2009); *see also, Evans v. Mercedes Benz Fin. Servs.*, LLC, 2011 WL 2936198, at *2 (E.D. Mich. July 21, 2011) ("Even excusing plaintiff's failure to follow Rules 8(a)(2) and 10(b), a *pro se* plaintiff must comply with basic pleading requirements, including Rule 12(b)(6).").

## V.    Screening Analysis

Plaintiff brings a novel claim against the Washtenaw Defendants: he asserts a claim for failure to protect from a deliberate indifference to his serious medical needs. (ECF No. 42, PageID.436, PageID.438-42). As the parties did not address this claim, the Court shall screen the complaint about this claim.

First, prisoners have a constitutional right under the Eighth Amendment to be free from violence at the hands of other inmates. *Farmer v. Brennan*, 511 U.S. 825, (1994); *Wilson v. Seiter*, 501 U.S. 294, (1991); *Richko v. Wayne Cnty.*, 819 F.3d 907, 915 (6th Cir. 2016). The claims that arise from a breach of this duty to

protect prisoners from violence at the hands of other prisoners are known as failure-to-protect claims.

"It is not, however, every injury suffered by one prisoner at the hands of another that translates into constitutional liability for prison officials responsible for the victim's safety." *Farmer*, 511 U.S. at 834. Courts apply a subjective and objective deliberate indifference analysis to failure to protect claims. *Westmoreland v. Butler Cnty., Kentucky*, 29 F.4th 721, 726 (6th Cir. 2022).

Under the objective component, "[f]or a claim . . . based on a failure to prevent harm, the inmate must show that he is incarcerated under conditions posing a substantial risk of serious harm." *Farmer*, 511 U.S. at 834. The subjective component requires an inmate to show that the individual defendants (1) were "aware of facts from which the inference could be drawn that a substantial risk of serious harm exists"; (2) actually drew the inference; and (3) consciously disregarded the risk. *Id.* at 837, 839; *Mangum v. Repp*, 674 F. App'x 531, 537 (6th Cir. 2017).

The undersigned notes that Plaintiff's claim appears to be that the Washtenaw Defendants failed to protect him from harm at the hands of medical staff at Washtenaw County Jail. (ECF No. 42, PageID.436, PageID.438-42). Plaintiff cites no authority that a failure-to-protect claim applies in this context, and the undersigned is unaware of authority to such effect. As a result, Plaintiff has

failed to state a claim and the undersigned recommends this claim be dismissed.  A claim for deliberate indifference to a medical need provides the cause of action for a lack of medical care.  As far as Plaintiff's claim could be construed as a supervisory liability claim, the constitution does not provide liability for failure to adequately supervise.  *Crawford v. Tilley*, 15 F.4th 752, 761 (6th Cir. 2021) ("[A] supervisor cannot be held liable simply because he or she was charged with overseeing a subordinate who violated the constitutional right of another.") (further citation omitted).

Even assuming if a failure-to-protect claim could be applied in the medical context, as discussed earlier in this Report and Recommendation Plaintiff has failed to prove that he can satisfy the objective prong required for deliberate indifference.  The same analysis would presumably govern here.  In any event, Plaintiff has failed to state a failure-to-protect claim.

## VI.    Recommendation

For the reasons set forth above, the undersigned **RECOMMENDS** that the Defendants' motion for summary judgment (ECF No. 156) be **GRANTED** and the Washtenaw Defendants be **DISMISSED.**   The undersigned further **RECOMMENDS** that the failure-to-protect claim against the Washtenaw Defendants be **DISMISSED** pursuant to screening the amended complaint.

The parties to this action may object to and seek review of this Report and

Recommendation but are required to file any objections within 14 days of service, as provided for in Federal Rule of Civil Procedure 72(b)(2) and Local Rule 72.1(d).  Failure to file specific objections constitutes a waiver of any further right of appeal.  *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health and Hum. Servs.*, 932 F.2d 505 (6th Cir. 1981).  Filing objections that raise some issues but fail to raise others with specificity will not preserve all the objections a party might have to this Report and Recommendation.  *Willis v. Sec'y of Health and Hum. Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Loc. 231*, 829 F.2d 1370, 1373 (6th Cir. 1987).  Pursuant to Local Rule 72.1(d)(2), any objections must be served on this Magistrate Judge.

Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc.  Any objection must recite precisely the provision of this Report and Recommendation to which it pertains.  Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity.  Fed. R. Civ. P. 72(b)(2), Local Rule 72.1(d).  The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," etc.  If the Court determines that any objections are without merit, it may rule without awaiting the response.

Date:  August 17, 2023          s/Curtis Ivy, Jr.
                                Curtis Ivy, Jr.
                                United States Magistrate Judge

## **CERTIFICATE OF SERVICE**

I hereby certify that a copy of the foregoing document was served upon the parties and/or counsel of record on August 17, 2023, by electronic means and/or ordinary mail.

                                s/Kristen MacKay
                                Case Manager
                                (810) 341-7850

25