UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

THERON HUNTER,                         Case No. 20-10534

        Plaintiff,          Nancy G. Edmunds
v.                                      United States District Judge

KATHLEEN HOLMES, *et al.*,              Curtis Ivy, Jr.
                                        United States Magistrate Judge
        Defendants.
_____/

## REPORT AND RECOMMENDATION ON WELLPATH DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (ECF No. 183); SCREENING PLAINTIFF'S COMPLAINT AS TO DEFENDANTS CORIZON, JOHN DOE, AND DANA DOE.

Plaintiff filed this lawsuit without the assistance of counsel on February 28, 2020.  (ECF No. 1).  This matter was referred to the undersigned for all pretrial matters.  (ECF No. 10).  This matter is presently before the Court regarding the Wellpath Defendants'[1] motion for summary judgment and for screening.  (ECF No. 183).  For the following reasons, the undersigned recommends the Court **GRANT** the motion and **DISMISS** all other remaining claims against Corizon and John and Dana Doe pursuant to screening.

## I.     Standard for Summary Judgment

---

[1] Defendants Parker, Holmes, Isley, and Gorka are collectively the Wellpath Defendants. (ECF No. 183, PageID.3055).

1

Summary judgment is mandated "after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to the party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A motion for summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is material if it might affect the outcome under governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). When evaluating a motion for summary judgment, the Court "views the evidence, all facts, and any inferences that may be drawn from the facts in the light most favorable to the nonmoving party." *Pure Tech Sys., Inc. v. Mt. Hawley Ins. Co.*, 95 F. App'x 132, 135 (6th Cir. 2004).

"The moving party has the initial burden of proving that no genuine issue of material fact exists. . . ." *Stansberry v. Air Wis. Airlines Corp*., 651 F.3d 482, 486 (6th Cir. 2011) (internal quotations omitted); *cf.* Fed. R. Civ. P. 56(e)(2) (providing if a party "fails to properly address another party's assertion of fact," then the court may "consider the fact undisputed for purposes of the motion"). "Once the moving party satisfies its burden, 'the burden shifts to the nonmoving party to set forth specific facts showing a triable issue.'" *Wrench LLC v. Taco Bell Corp*., 256 F.3d 446, 453 (6th Cir. 2001) (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith*

*Radio Corp.*, 475 U.S. 574, 587 (1986)).  The nonmoving party must "make an affirmative showing with proper evidence in order to defeat the motion." *Alexander v. CareSource*, 576 F.3d 551, 558 (6th Cir. 2009); *see also Lee v. Metro. Gov't of Nashville & Davidson Cty.*, 432 F. App'x 435, 441 (6th Cir. 2011) ("The nonmovant must, however, do more than simply show that there is some metaphysical doubt as to the material facts, there must be evidence upon which a reasonable jury could return a verdict in favor of the non-moving party to create a genuine dispute.") (internal quotation marks and citation omitted).  In other words, summary judgment is appropriate when "a motion for summary judgment is properly made and supported and the nonmoving party fails to respond with a showing sufficient to establish an essential element of its case. . . ." *Stansberry*, 651 F.3d at 486 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986)).

That Plaintiff is *pro se* does not reduce his obligations under Rule 56.  Rather, "liberal treatment of *pro se* pleadings does not require lenient treatment of substantive law." *Durante v. Fairlane Town Ctr.*, 201 F. App'x 338, 344 (6th Cir. 2006).  In addition, "[o]nce a case has progressed to the summary judgment stage, . . . 'the liberal pleading standards under *Swierkiewicz* [*v. Sorema*, *N.A.*, 534 U.S. 506, 512-13 (2002)] and [the Federal Rules] are inapplicable.'" *Tucker v. Union of Needletrades, Indus. & Textile Emps.*, 407 F.3d 784, 788 (6th Cir. 2005) (quoting *Gilmour v. Gates, McDonald & Co.*, 382 F.3d 1312, 1315 (11th

Cir. 2004)).  The Sixth Circuit has made clear that, when opposing summary judgment, a party cannot rely on allegations or denials in unsworn filings and that a party's "status as a *pro se* litigant does not alter [this] duty on a summary judgment motion."  *Viergutz v. Lucent Techs., Inc.*, 375 F. App'x 482, 485 (6th Cir. 2010); *see also United States v. Brown*, 7 F. App'x 353, 354 (6th Cir. 2001) (affirming grant of summary judgment against a *pro se* plaintiff because he "failed to present any evidence to defeat the government's motion").

## II.   Factual Background

Plaintiff's verified complaint raises claims under the Eighth Amendment, medical malpractice, negligence, gross negligence, '*respondeat superior*,' and intentional infliction of emotional distress related to alleged failure to treat an elbow injury.  (ECF No. 42).  Defendants Parker, Holmes, Gorka, and Isely moved for summary judgment on May 5, 2023.  (ECF No. 183).  Parker is a medical provider who was contracted with Wellpath, L.L.C., ("Wellpath") to provide medical services to patients detained at Washtenaw County Jail.  (*Id.* at PageID.3065).  Holmes was a registered nurse and Wellpath employee acting as the nurse educator at Washtenaw County Jail.  (*Id.*).  Both Gorka and Isely were nurses employed by Wellpath to provide nursing services to patients detained at Washtenaw County Jail.  (*Id.*).  Wellpath is not a party to this lawsuit.

Plaintiff was injured on March 22, 2018, while at the Washtenaw County

4

Jail. (ECF No. 42, PageID.362). He alleges that he was on the basketball court and while he was bent over to pick up the ball, another inmate "jumped on my back and bear hugged me" causing Plaintiff to fall and bang his elbow on the concrete. (*Id.*).

Plaintiff was seen by a nurse around two or three hours after he was injured. (*Id.* at PageID.363). She cleaned Plaintiff's arm and examined the injury, concluding she did not believe it was broken just badly scraped. (*Id.*). The Wellpath Defendants indicate that a licensed practical nurse ("LPN") cleaned Plaintiff's wounds, administered alcohol and antibiotic ointment, and bandaged Plaintiff's arm. (ECF No. 183, PageID.3066). On March 23, 2018, at around 10 P.M., Plaintiff alleges his elbow and forearm muscles started to hurt badly from the injury. (ECF No. 42, PageID.363). On March 24, 2018, he put in a kite[2] for medication and he alleges his "arm was locked in a 90 [degree] angle and hurt very bad." Plaintiff alleges that during the evening of March 24, 2018, he was denied ibuprofen by Defendant Nurse "Rocky" Isely because he did not put a medication slip into the box outside the cell block, a procedure which Plaintiff asserts is not posted anywhere nor in the jail rule book. (*Id.* at PageID.364). Plaintiff alleges he showed Defendant Isely that his arm was locked in a 90 degree angle and was now

---

[2] A "kite" is a form that allows inmates to communicate and get information about "just about anything," including court dates, visitors, lawyers' information, requests, complaints, or medical assistance. *See, e.g., Meirs v. Ottawa Cnty.*, 821 F. App'x 445, 448 (6th Cir. 2020).

"swollen twice the size of the other arm[.]" (*Id.*).  Wellpath Defendants allege that

Defendant Isely advised Plaintiff that Isely could not administer over-the-counter

medication without Plaintiff having first requested medication via a medication

slip or otherwise having a doctor's order for the medication.  (ECF No. 183,

PageID.3067).

Plaintiff submitted another kite on March 25, 2018.  (ECF No. 42,

PageID.364).  Plaintiff alleges Defendant Kathleen Holmes was aware of his injury

because it was referenced in the kite and she saw his condition on March 26, 2018,

but she did not schedule an appointment for Plaintiff to see the doctor.  (*Id.*).

Plaintiff alleges that on March 26, 2018, that he asked an unknown nurse about his

arm and told her he was becoming worried because his arm was not improving.

(*Id.* at PageID.365).  The nurse prescribed Plaintiff ibuprofen and put in a note for

Plaintiff to see the nurse practitioner.  (*Id.*) (asserting the nurse "put [Plaintiff] on

to see the nurse practitioner[.]").  The Wellpath Defendants indicate that LPN

Lonchyna provided treatment on March 26, 2018.  (ECF No. 183, PageID.3068).

During the evening medication distribution, Plaintiff alleges when he asked a nurse

about his ibuprofen that Defendant Kathleen Holmes confronted Plaintiff about his

grievance, was unconcerned about Plaintiff's injury, and told Plaintiff that neither a

doctor nor a nurse practitioner would be in that week.  (ECF No. 42, PageID.365).

Plaintiff was seen by Defendant Doctor Darryl Parker on March 27, 2018.

(*Id.* at PageID.366).  Plaintiff alleges that his ibuprofen was only ordered for five days, ending on March 31, 2018.  (*Id.*).  Plaintiff alleges that the injury was not effectively treated with ibuprofen and Plaintiff's arm was still swollen and locked.  (*Id.*).  The Wellpath Defendants agree that Parker treated Plaintiff on March 27, 2018.  (ECF No. 183, PageID.3068).  Defendants indicate that Plaintiff described his injury and denied numbness, weakness, and pain in the right elbow.  (*Id.*) (citing ECF No. 183-6, PageID.3134; ECF No. 183-2, PageID.3095).  The treatment records reflect that Plaintiff could not extend his arm fully but reported he was not in pain.  (*Id.*).  Parker noted a "superficial abrasion on Mr. Hunter's forearm which was healing well, without swelling" and that the elbow appeared otherwise normal, not swollen or discolored.  (*Id.*).  Parker ordered an X-ray, which was performed the same day.  (*Id.*) (citing ECF No. 183-6, PageID.3136); (ECF No. 42, PageID.365).

Non-party Nicolaus Kuehn, M.D., read the X-ray on March 28, 2018.  (ECF No. 183, PageID.3069).  Kuehn noted that Plaintiff did not have an acute fracture or dislocation, osseous structures appeared to be intact, and soft tissues were unremarkable.  (*Id.*).  Kuehn concluded that given that joint spaces were narrowed, there were no acute osseous abnormalities and only degenerative changes to Plaintiff's elbow.  (*Id.*) (citing ECF No. 183-6, PageID.3137).

Defendants indicate that on March 28, 2018, Defendant Holmes responded

to Plaintiff's kite and informed him Isely was correct that detainees are required to submit a med slip prior to receiving over-the-counter medication and Plaintiff could kite to request medication and evaluation. (*Id.*). Holmes also noted she reviewed the medical records and Plaintiff had been seen twice regarding his injury and was awaiting the results of his X-ray. (*Id.*).

Defendants indicate that Parker reviewed Plaintiff's X-ray on April 4, 2018. (*Id.* at PageID.3070) (citing ECF No. 183-2, PageID.3096). On April 5, 2018, and April 9, 2018, Plaintiff submitted kites because he had not yet received his X-ray results. (ECF No. 42, PageID.366-67).

On April 10, 2018, Plaintiff asserts he received a kite from medical that conveyed the X-ray results came back normal and the ibuprofen was restarted. (*Id.* at PageID.368). On April 11, 2018, a nurse examining Plaintiff wrote "R+arm muscle/tendon issue MD list" on the medical kite from April 10, 2018. (*Id.*). On April 11, 2018, Defendant Parker examined Plaintiff. (*Id.*; ECF No. 183, PageID.3070). Plaintiff alleges Parker told Plaintiff that stretching was the only thing that would help Plaintiff's arm. (ECF No. 42, PageID.368). Plaintiff asked about steroids, because Plaintiff alleges steroids are good for swelling. (*Id.*). Parker told Plaintiff that ibuprofen is better for swelling than steroids and switched Plaintiff's prescription to ibuprofen twice a day and Naproxen twice a day. (*Id.*). Plaintiff asked about being put on a high protein diet for tendon and ligament

8

injuries because he assumed it would be good for tendon and ligament injuries. (*Id.* at PageID.369). Parker purportedly told Plaintiff they did not have high protein diets at the jail, which Plaintiff notes is a lie because high protein diets are given to prisoners who are heavy drugs addicts and underweight. (*Id.*). Plaintiff also asked about getting an MRI or a CAT scan. (*Id.*). Parker allegedly told Plaintiff further imaging was not needed because the X-ray came back normal. (*Id.*). Plaintiff alleges Parker told him an X-ray would "pick up on muscle tears, and tendon and ligament problems and injuries. Which to Plaintiff's knowledge is a lie." (*Id.*).

Parker notes he did evaluate Plaintiff on April 11, 2018, and noted that the X-ray results were negative. (ECF No. 183, PageID.3070). Upon evaluation, Parker found that Plaintiff's elbow and forearm were nontender with no deformity, but Plaintiff still had a reduced range of motion in his arm. (*Id.*) (citing ECF No. 183-6, PageID.3140) (noting "only a 165-degree range of motion"). Parker advised Plaintiff to continue to stretch out his arm to regain extension and prescribed Plaintiff 500 mg tablets of Naproxen twice daily for 21 days. (*Id.*).

On April 17, 2018, Plaintiff notes he sent a kite addressing the visit of April 11, 2018,[3] explaining he was having "an extreme increase in pain due to the

---

[3] Plaintiff noted he was uncertain of the date he was evaluated by Parker. (ECF No. 42, PageID.368). The undersigned notes it appears Plaintiff was evaluated on April 11, 2018, not April 12, 2018, as the allegations about this kite states. (*Id.* at PageID.370; ECF No. 183,

stretching" prescribed.  (ECF No. 42, PageID.370).  Plaintiff indicates he disagreed with Parker's diagnosis and felt he needed an MRI or CAT scan.  (*Id.*).  Plaintiff requested ibuprofen along with the Naproxen because he was still in pain.  (*Id.*).  Plaintiff indicates his arm was swollen.  (*Id.*).  This kite was referred to Parker, who reviewed it on April 20, 2018.  (ECF No. 183, PageID.3071).  Parker entered an order for Plaintiff to have a physical therapy session to teach him proper stretching of his arm and the referral form also noted that Plaintiff had the ability to perform activities of daily living within normal limits.  (*Id.*).  Parker notes that he is not involved with scheduling of specialist consultations.  (*Id.*).  A registered nurse placed a note in Plaintiff's medical records stating that the administrative assistant was informed of the order for a physical therapy appointment so the appointment could be scheduled.  (*Id.*) (citing ECF No. 183-6, PageID.3146).

On May 6, 2018, Plaintiff sent a kite asking for an update on the physical therapy and explaining he was still in pain.  (ECF No. 42, PageID.373).  On May 10, 2018, Plaintiff turned in a kite alleging the kite from May 6, 2018, had "vanished" and reiterating the same concerns as the May 6 kite and additionally noting he was waking up at night because of pain.  (*Id.*).  Plaintiff was told that he could not be told the date of his physical therapy for "security reasons" but that Plaintiff could rest assured that the appointment had been scheduled.  (*Id.*).

---

PageID.3071).

On June 20, 2018, Plaintiff indicates he turned in a kite. (*Id.* at PageID.377). Nurse Dana Doe came to see Plaintiff. (*Id.*). Plaintiff suggests he was stretching his arm "constantly" as ordered without improvement. He noted he was still experiencing pain and it was waking him from his sleep often. (*Id.*). Medical notified Plaintiff they could not notify Plaintiff of outside appointments based on to security concerns and appointments are scheduled based on outside facilities availability, and they can have limited appointments. (*Id.*).

On June 26, 2018, Plaintiff sent a medical kite notifying the medical department of potential risks involved in continuing to delay proper medical treatment for his arm including allegedly permanent disfigurement and pain. (*Id.* at PageID.378). Plaintiff asserts he may require surgery or suffer permanent disfigurement. (*Id.*). The same day, Plaintiff sent a kite to former Defendant Casey seeking clarification as to what further administrative steps Plaintiff could take to receive proper medical care. (*Id.* at PageID.378-79). Plaintiff alleges this kite was never responded to.

Plaintiff notes that he received a response the same day as his June 26, 2018, kite was sent. (*Id.* at PageID.378). The response noted that Plaintiff's appointment had been made. (*Id.*). Plaintiff asserts his appointment was not scheduled anywhere close to April 17, 2018. (*Id.*).

Plaintiff alleges that Defendant Holmes is the head of the medical

11

department, and he sent her a kite on July 5, 2018, in which he indicated that the treatment Plaintiff was receiving was ridiculous and Plaintiff was still in lots of pain and had not received physical therapy.  (*Id.* at PageID.379).

Plaintiff alleges that on July 8, 2018, he was instructed by the unit officer that non-party Sergeant Clifton wanted Plaintiff to write him a kite explaining everything that was going on with Plaintiff and his medical care.  (*Id.* at PageID.390).  Plaintiff asserts that this was a "charade" orchestrated by former Defendant Alverez because Alverez had denied Plaintiff's kites the day prior and denied Plaintiff's mother's request to talk to the Sheriff.  (*Id.*at PageID.391). Plaintiff alleges he believes former Defendant Schiappacasse "was in on this as well" because Defendant Holmes consistently mentioned Schiappacasse when Plaintiff and Holmes spoke on July 10, 2018.  (*Id.*).

Plaintiff alleges he and Defendant Holmes spoke on July 10, 2018, related to his July 5, 2018, kite.  Plaintiff alleges Defendant Holmes explained that Defendant Shiappacasse took over for Defendant Williams overseeing the medical department.  (*Id.* at PageID.381).  That same day Holmes allegedly told Plaintiff the delay in physical therapy had been way too long and she would expedite the appointment.  (*Id.* at PageID.383).  Plaintiff alleges this was a lie and he was already scheduled for an appointment on July 12, 2018.  (*Id.*).  Holmes also allegedly said she would consult with "CO/Lt for injury reports" and Plaintiff

alleges this response "clearly shows Lieutenants Shiappacasse, and Lieutenant Williams role when it comes to the medical department." (*Id.* at PageID.384).

Defendants agree that Defendant Holmes spoke with Plaintiff on July 10, 2018. (ECF No. 183, PageID.3074). Holmes purports she told Plaintiff she would work with Lieutenant Shiappacasse on the medical issues. (*Id.*). Holmes then advised Plaintiff his pain had been addressed and he had continuously been prescribed Naproxen since April 11, 2018. (*Id.*). Holmes informed Plaintiff his X-ray was negative and revealed no signs of osseous abnormality. (*Id.*). Holmes also noted that Plaintiff was not prescribed a high protein diet, but if he wanted extra protein there were options available to him at commissary. (*Id.*). Holmes also advised Plaintiff that the University of Michigan Physical Therapy had held up his appointment. (*Id.*). Holmes noted that Dr. Parker would follow up with Plaintiff after the physical therapy appointment took place. (*Id.*).

On July 12, 2018, Plaintiff alleges he was taken to physical therapy, but Plaintiff asserts the therapist was "the wrong physical therapist." (ECF No. 42, PageID.386). Plaintiff alleges the physical therapist he saw specialized in backs, not in arms or the injury that Plaintiff suffered. (*Id.* at PageID.387). The physical therapist recommended a hot compress on his arm and, upon further questioning from Plaintiff, stated that ice would be a second option if no hot compress was available. (*Id.*). On July 14, 2018, Plaintiff sent a kite stating "he went to physical

13

therapy on 7/12/18 and the therapist wanted him to ice his elbow twice a day for 30 min." (*Id.*).  Plaintiff alleges he was told by a nurse that the medical department did not have hot packs, but that this was a lie because when he received a cold pack on July 16, 2018, that it was a cold and hot reusable, microwavable compress. (*Id.*).  Plaintiff alleges that some days he was not brought any ice packs or if he did receive ice packs that the pack was only cold for five minutes.  (*Id.* at PageID.396-405).

Defendants agree that Plaintiff saw a physical therapist on July 12, 2018. (ECF No. 183, PageID.3074).  They note Plaintiff was seen by a University of Michigan physical therapist who provided Plaintiff with a home exercise program and recommended that Plaintiff ice his arm for 20-30 minutes a day, twice daily. (*Id.*).  The physical therapist recommended Plaintiff return for four to five more visits, once per a week.  (*Id.*).  Defendants assert Plaintiff was provided an ice pack pursuant to the physical therapists' recommendation.  (*Id.* at PageID.3075).  Dr. Parker entered an order for Plaintiff to return to the physical therapist three more times.  (*Id.*).  Defendants indicate Plaintiff went to the physical therapist on July 25, 2018, August 3, 2018, and August 9, 2018.  (*Id.*).  They also note Plaintiff continued to receive Naproxen throughout the rest of his detainment at Washtenaw County Jail.  (*Id.*).  The undersigned notes that on August 15, 2018, Plaintiff was released from the Washtenaw County Jail.  (ECF No. 42, PageID.405).

14

Plaintiff alleges that "something was popping out of his arm" while he did his physical therapy exercises and he was uncertain if he should continue his physical therapy exercises as a result of pain after he finished them. (*Id.* at PageID.388). The medical department instructed Plaintiff to speak with his physical therapist on July 25, 2018. (*Id.*). On July 18, 2018, Plaintiff met with Defendant Holmes in medical. (*Id.*at PageID.395). Holmes brought Plaintiff a large, completely frozen ice pack from home because Plaintiff complained the cold compresses from the medical department were not sufficiently cold. (*Id.*). Holmes allegedly told Plaintiff he had arthritis in his elbow from old age, but Plaintiff alleges Holmes failed to tell Plaintiff of the "scattered loose bodies" in his elbow and was using old age to try to convince Plaintiff that medical "did right by him." (*Id.* at PageID.393-96). Plaintiff also asked Holmes about the possibility of hot compresses, but Holmes stated that Washtenaw County Jail does not do hot compresses. (*Id.* at PageID.396). Holmes also allegedly said that ice is best for inflammation. (*Id.*).

On August 15, 2018, Plaintiff was released from the Washtenaw County Jail into the custody of the Van Buren Police Department and subsequently bonded out on August 16, 2018. (*Id.* at PageID.405). After Plaintiff was released, he saw various medical providers of his own accord. He alleges Washtenaw County Jail and Defendant Corizon would not release his medical records from his time in

Washtenaw County Jail.  (*Id.* at PageID.410-14).

Plaintiff also includes more generalized allegations that the undersigned shall summarize here.  Plaintiff alleges various nurses "lied" to him that there were not hot packs available.  (*Id.* at PageID.387).  Plaintiff also alleges that at various times he did not receive a cold pack or that the cold packs he received were not sufficiently cold.  (*Id.* at PageID.394-407).

Plaintiff alleges that "through seeking further medical care" that his X-ray showed "fragments" in his elbow which were most likely "small pieces of bone up to 6 millimeters big scattered through Plaintiff's elbow."  (*Id.* at PageID.369).  Plaintiff was later seen by a doctor at the University of Michigan, about six months after Plaintiff was injured.  (*Id.* at PageID.371).  That doctor allegedly told Plaintiff "he believed this condition will be permanent that there is little chance my arm would return [to normal] from physical therapy, and he. . . didn't think surgery would help."  (*Id.*).

Defendants note that a doctor at the University of Michigan Medicine saw Plaintiff on October 1, 2018.  (ECF No. 183, PageID.3075).  That doctor ordered an MRI which found mild common flexor tendinosis and degenerative changes.  (*Id.*).  On October 30, 2018, Plaintiff saw that doctor again and the doctor opined that Plaintiff had a "likely resolved strain of the distal bicep tendon or potentially even resolving bursitis from forced over stretching."  (*Id.*) (citing ECF No. 156-4,

PageID.2784).  Surgery was not recommended, and the doctor concluded there might be limited returns from occupational therapy.  (*Id.*).  No medication was prescribed.  (*Id.*).  Plaintiff subsequently canceled an appointment scheduled for November 27, 2018, and no showed an appointment at Michigan Orthopedic Surgery Clinic on December 3, 2018.  (*Id.* at PageID.3076).[4]

### III.   Analysis on Defendants' Motion for Summary Judgment

On May 5, 2023, Defendants Parker, Holmes, Isely, and Gorka moved for summary judgment.  (ECF No. 183).

The undersigned notes the docket appears to reflect that Plaintiff filed no response brief.  As noted, the Wellpath Defendants filed this motion on May 5, 2023.  (ECF No. 183).  On May 9, 2023, the Court ordered Plaintiff to respond by June 23, 2023.  (ECF No. 184).  On June 26, 2023, Plaintiff moved for an extension of the time to respond to the Wellpath Defendants' motion for summary judgment because Plaintiff stated he never received the Court's Order requiring a response.  (ECF No. 201).  The Court granted the extension and set a new deadline

---

[4] The undersigned notes that Plaintiff briefly includes some factual allegations that are unrelated to his arm.  These facts do not seem related to any of Plaintiff's claims in his complaint, but the undersigned includes them here in the interest of completeness.  Plaintiff alleges that on June 3, 2018, he turned in a medical kite because his sides were hurting, and blood leaked out of his penis.  (ECF No. 42, PageID.374-75).  Plaintiff alleges that the front of his boxers was "almost completely covered" in blood and that he did not have any cuts.  (*Id.* at PageID.375).  Plaintiff alleges various nurses were unconcerned with his condition.  (*Id.*).  On June 5, 2018, Plaintiff was seen by medical staff and Plaintiff declined to give a urine sample "because he no longer wanted to be seen for his penis, since it had been two days since the incident on 6/3/18, and his sides no longer hurt, and no more blood had leaked out his penis." (*Id.* at PageID.376).  Plaintiff also includes information about a broken tooth that does not appear to relate to any of his other allegations.  (*Id.* at PageID.379).

17

for Plaintiff to file a response brief of August 10, 2023.  (ECF No. 203).

That said, when Plaintiff filed his exhibits in response to a different motion for summary judgment, he appears to have filed his response brief directed at the Wellpath Defendants in the midst of those documents.  (ECF No. 211, PageID.3810; ECF No. 156).  In the interest of justice and hearing all the arguments, the Court will consider the content of this improperly filed brief.  As the brief in response to the Wellpath Defendants' motion for summary judgment was filed in such an unclear manner and nothing on the docket reflected that the brief responding to this motion was hidden in the exhibits in response to a different motion for summary judgment, the Wellpath Defendants understandably did not file a reply brief.

Plaintiff argues that the Wellpath Defendants have omitted or mischaracterized the facts to try to manipulate the Court.  (ECF No. 211, PageID.3815).  Plaintiff argues that the Defendants' characterization of his criminal history and reason for being in Washtenaw County Jail is incorrect.  (*Id.*).  This has no bearing on the adjudication of his claims.  Plaintiff notes that Parker was also the medical director and not just a doctor working at the jail.  (*Id.* at PageID.3816).  He also indicates that Holmes is not simply a registered nurse, but was also acting as the nurse educator and a health services administrator ("HSA").  (*Id.*).

18

Plaintiff directs the Court to a motion to dismiss filed on April 15, 2021, in this matter to argue that the Defendants "stated in the Wellpath Defendants' pleading that they were Corizon employees." (*Id.*) (citing ECF No. 28, PageID.220). That page reflects that the Defendants argued "Plaintiff failed to put the Corizon Defendants on proper notice as required by MCL § 600.2912b." (ECF No. 28, PageID.220). To the point that this phrasing could be taken as a concession that the Defendants worked for Corizon, the Defendants have consistently and repeatedly conveyed in more recent filings that they are employed by Wellpath and Wellpath has been contracted to provide services in Washtenaw County Jail since 2014. (ECF No. 181, PageID.3047; ECF No. 183). One mention in one filing is insufficient to render this a material fact in genuine dispute.

In the next portion of his response, Plaintiff notes that he disagrees with some of his treatment records related to when he did or did not report pain or numbness when discussing his injury with providers. (ECF No. 211, PageID.3818). The undersigned has summarized Plaintiff's understanding of the record as well as the Defendants in the factual discussion of this Report and Recommendation and sees no reason repeat that here. Even so, another fact he raises in his response brief is that he received 33 of the 70 ice packs he was ordered to receive by the physical therapist. (*Id.* at PageID.3825).

19

Plaintiff brings a claim of deliberate indifference under the Eighth Amendment against Defendants Holmes, Parker, Isely, and Gorka.  (ECF No. 42, PageID.445-460, ECF No. 42-1, PageID.473).  Plaintiff also asserts a failure-to-protect claim under the Eighth Amendment against Defendants Holmes.  (*Id.* at PageID.442) (failure to protect the Plaintiff from a deliberate indifference to his serious medical need).  Plaintiff also seeks to bring Michigan state tort claims for medical malpractice, negligence, gross negligence, intentional infliction of emotional distress, and '*respondeat superior*.'  (*Id.* at PageID.434).  The Court shall address each of these claims in turn.

The undersigned suggests that the Defendants were not deliberately indifferent.  The Eighth Amendment prohibits "cruel and unusual punishment" against individuals convicted of crimes.[5]  "The Eighth Amendment is violated when an official is deliberately indifferent to the serious medical needs of a prisoner in their care."  *Jones v. Cnty. of Kent*, 601 F. Supp. 3d 221, 243 (W.D. Mich. Apr. 29, 2022) (citations omitted).  Because the "Eighth Amendment prohibition against cruel and unusual punishments applies to the [S]tates through the Fourteenth Amendment, . . . prisoners may sue [S]tate prison authorities for

---

[5] The undersigned presumes Plaintiff is a prisoner and his claims are governed by the Eighth Amendment because no party suggests that Plaintiff is a pretrial detainee, which would mean the Fourteenth Amendment governs his claims.  The Eighth and Fourteenth Amendment deliberate indifference standards are largely the same except the subjective component is modified in cases brought by pretrial detainees.  *Brawner v. Scott Cnty., Tenn.*, 14 F.4th 585 (6th Cir. 2021).

Eighth Amendment violations." *Rhinehart v. Scutt*, 894, F.3d 721, 735 n.12 (6th Cir. 2018) (citing *Robinson v. California*, 370 U.S. 660, 667 (1962)).

"A claim for the deprivation of adequate medical care has an objective and a subjective component." *Jones*, 601 F. Supp. 3d at 243 (citing *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)). For "the objective component, the plaintiff must establish that the medical need at issue is sufficiently serious." *Id.* (citing *Farmer*, 511 U.S. at 834). A prisoner can establish that he has a serious medical need if "a doctor has diagnosed a condition as requiring treatment or [ ] the prisoner has an obvious problem that any layperson would agree necessitates care." *Phillips v. Tangilag*, 14 F.4th 524, 534 (6th Cir. 2021) (citation omitted). "Only if a prisoner proves this objective element must courts consider the second (subjective) part of the deliberate-indifference test." *Id.* at 535.

"[I]f doctors effectively provide no care for [a serious medical need]," then the objective element is satisfied. *Id.* at 534 (citation omitted). But "[m]ore frequently, doctors provide some care and prisoners challenge their treatment choices as inadequate. To establish the objective element in this common situation, prisoners must show more." *Id.* at 534–35 (citations omitted). That is, the care must be "so grossly incompetent or so grossly inadequate as to shock the conscience or be intolerable to fundamental fairness." *Id.* at 535 (internal quotation marks and quotation omitted). "[T]o prove grossly inadequate care, . . .

21

courts generally require [prisoners] to introduce medical evidence, typically in the form of expert testimony." *Id.* (citations omitted). And "mere malpractice does not violate the Eighth Amendment. *Id.* (citing *Estelle v. Gamble*, 429 U.S. 97, 106 (1976)).

Here, it is clear to the undersigned that some level of care was provided to the Plaintiff. Plaintiff was seen by a nurse around two or three hours after he was injured. (ECF No. 42, PageID.363). Plaintiff was later seen by Defendant Doctor Darryl Parker and an X-ray was ordered to assess his injury. (*Id.* at PageID.366). Plaintiff was prescribed medication to manage his pain and to reduce the swelling in his arm, provided ice packs, and received physical therapy. Plaintiff's allegations that he was prescribed medication and received physical therapy are corroborated by Plaintiff's treatment records. While Plaintiff disputes the adequacy of this treatment plan and the speed of the treatment, it is not the case that doctors effectively provided no care for a serious medical need. And MRI results from the University of Michigan Medical Department notes that although "IA bodies are present, the size [of the IA bodies] are unlikely to cause the range of motion limitation [Plaintiff] is experiencing" and recommended continuing with the current treatment plan. (ECF No. 156-4, PageID.2783). The provider observed "[l]ikely resolved strain of the distal bicep tendon or potentially even resolving bursitis from forced over stretching." (*Id.* at PageID.2784). That assessment also

notes Plaintiff "continues to believe that [his injury] is preventing him [from] being functional despite having a function arc of at least 140 degrees with basically full supination and pronation." (*Id.*).

In order to succeed on his claim, Plaintiff must prove the care he received was grossly inadequate, which necessitates expert testimony. *Phillips*, 14 F.4th at 536 ("[Plaintiff] needed to present expert medical evidence describing what a competent doctor would have done and why the chosen course was not just incompetent but grossly so."). Here there is no evidence about what a competent doctor would have done and at the summary judgment stage the absence of such evidence is fatal to Plaintiff's claim. Indeed, the Wellpath Defendants note that Plaintiff conceded at his deposition that he has not retained an expert. (ECF No. 183, PageID.3082). Plaintiff's reply brief is irrelevant to this analysis. (ECF No. 211, PageID.3811).

While a defendant may not avoid liability for deliberate indifference by providing some medical care, a plaintiff must present expert medical evidence demonstrating why the chosen course was grossly incompetent. Plaintiff's complaint details the various ways in which he feels the care he received was in adequate, but Plaintiff presents no expert evidence related to the standard of care. Plaintiff has not demonstrated that the care he received was grossly inadequate and the undersigned suggests summary judgment is appropriate for the Wellpath

Defendants on the deliberate indifference claim.

The Defendants failed to address Plaintiff's failure-to-protect-from-deliberate-indifference claim against Holmes in their motion for summary judgment. This claim is addressed substantively later in this report, where the undersigned recommends this claim be dismissed pursuant to screening Plaintiff's complaint.

As to Plaintiff's state-law claims for medical malpractice, negligence, gross negligence, intentional infliction of emotional distress, and 'respondeat superior,'[6] the undersigned suggests the Court decline supplemental jurisdiction on these claims because all the federal claims would be dismissed. (ECF No 42, PageID.434). Under 28 U.S.C. § 1367, a district judge may decline to exercise supplemental jurisdiction over state-law claims if "the district court has dismissed all claims over which it has original jurisdiction. . . ." 28 U.S.C. § 1367(c)(3). "When all federal claims are dismissed before trial, the balance of considerations usually will point to dismissing the state law claims [.]" *Musson Theatrical, Inc. v. Express Corp.*, 89 F.3d 1244, 1254-55 (6th Cir. 1996). Indeed, the Sixth Circuit

---

[6] To the extent that Plaintiff's claim could be taken as raising a claim of *respondeat superior* under §1983, there is no *respondeat superior* under §1983. *See Monell v. Department of Soc. Svs.*, 436 U.S. 658, 691-92 (1978) (explaining that Section 1983 liability cannot be based on a theory of *respondeat superior* or vicarious liability); *Everson v. Leis*, 556 F.3d 484, 495 (6th Cir. 2009) (same); *Taylor v. Michigan Dep't of Corrs.*, 69 F.3d 76, 80-81 (6th Cir. 1995) (explaining that plaintiff must allege facts showing that the defendant participated, condoned, encouraged, or knowingly acquiesced in alleged misconduct to establish liability).

has repeatedly advised that the district courts should not exercise supplemental

jurisdiction over state-law claims where all original jurisdiction claims have been

dismissed.  *See*, *e.g.*, *Brown v. Cassens Transp. Co.*, 546 F.3d 347, 363 (6th Cir.

2008).  The undersigned recommends Plaintiff's state-law claims against the

Wellpath Defendants be dismissed without prejudice.

## IV.    Screening Standard

As noted earlier, Plaintiff appears to bring a failure-to-protect claim against

Defendant Holmes and the Defendants do not address this claim against Holmes in

their motion for summary judgment.  The Court shall screen the complaint

pursuant to 28 U.S.C. § 1915 and 42 U.S.C. § 1997e regarding the failure-to-

protect claim against Defendant Holmes.

When a plaintiff is proceeding *in forma pauperis*, "the court shall dismiss

the case at any time if the court determines that . . . the action or appeal . . . fails to

state a claim on which relief may be granted."  28 U.S.C. § 1915(e)(2)(B)(ii); *see*

*also* 42 U.S.C. § 1997e(c).  The dismissal standard of Federal Rule of Civil

Procedure 12(b)(6) described in *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007),

governs failure to state a claim under § 1997e(c).  *Hill v. Lappin*, 630 F.3d 468,

470-71 (6th Cir. 2010).  "[A] complaint must contain sufficient factual matter,

accepted as true, to state a claim to relief that is plausible on its face."  *Ashcroft v.*

*Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation omitted); *see also Bell Atl.*

*Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (concluding that a plausible claim need not contain "detailed factual allegations," but it must contain more than "labels and conclusions" or "a formulaic recitation of the elements of a cause of action"). Facial plausibility is established "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. "The plausibility of an inference depends on a host of considerations, including common sense and the strength of competing explanations for the defendant's conduct." *16630 Southfield Ltd., P'Ship v. Flagstar Bank, F.S.B.*, 727 F.3d 502, 503 (6th Cir. 2013).

The Court holds *pro se* complaints to "less stringent standards than formal pleadings drafted by lawyers." *Haines v. Kerner*, 404 U.S. 519, 520 (1972). That said, even in pleadings drafted by *pro se* parties, "'courts should not have to guess at the nature of the claim asserted.'" *Frengler v. Gen. Motors*, 482 F. App'x 975, 976-77 (6th Cir. 2012) (quoting *Wells v. Brown*, 891 F.2d 591, 594 (6th Cir. 1989)). "[C]ourts may not rewrite a complaint to include claims that were never presented . . . nor may courts construct the Plaintiff's legal arguments for him. Neither may the Court 'conjure up unpled allegations[.]'" *Rogers v. Detroit Police Dep't*, 595 F. Supp. 2d 757, 766 (E.D. Mich. 2009); *see also, Evans v. Mercedes Benz Fin. Servs.*, LLC, 2011 WL 2936198, at *2 (E.D. Mich. July 21, 2011) ("Even excusing plaintiff's failure to follow Rules 8(a)(2) and 10(b), a *pro*

*se* plaintiff must comply with basic pleading requirements, including Rule

12(b)(6).").

## V.    Screening Analysis

Plaintiff brings a novel claim against Defendant Holmes: he asserts a claim

for failure to protect from a deliberate indifference to his serious medical needs.

(ECF No. 42, PageID.442-43).

First, prisoners have a constitutional right under the Eighth Amendment to

be free from violence at the hands of other inmates.  *Farmer v. Brennan*, 511 U.S.

825, (1994); *Wilson v. Seiter*, 501 U.S. 294, (1991); *Richko v. Wayne Cnty.*, 819

F.3d 907, 915 (6th Cir. 2016).  The claims that arise from a breach of this duty to

protect prisoners from violence at the hands of other prisoners are known as

failure-to-protect claims.

"It is not, however, every injury suffered by one prisoner at the hands of

another that translates into constitutional liability for prison officials responsible

for the victim's safety."  *Farmer*, 511 U.S. at 834.  Courts apply a subjective and

objective deliberate indifference analysis to failure to protect claims.

*Westmoreland v. Butler Cnty., Kentucky*, 29 F.4th 721, 726 (6th Cir. 2022).

Under the objective component, "[f]or a claim . . . based on a failure to

prevent harm, the inmate must show that he is incarcerated under conditions posing

a substantial risk of serious harm."  *Farmer*, 511 U.S. at 834.  The subjective

component requires an inmate to show that the individual defendants (1) were "aware of facts from which the inference could be drawn that a substantial risk of serious harm exists"; (2) actually drew the inference; and (3) consciously disregarded the risk. *Id.* at 837, 839; *Mangum v. Repp*, 674 F. App'x 531, 537 (6th Cir. 2017).

The undersigned notes that Plaintiff's claim appears to be that Defendant Holmes failed to protect him from harm at the hands of medical staff at Washtenaw County Jail.  (ECF No. 42, PageID.442-43).  Plaintiff cites no authority that a failure-to-protect claim applies in this context, and the undersigned is unaware of authority to such effect.  As a result, Plaintiff has failed to state a claim and the undersigned recommends this claim be dismissed.  A claim for deliberate indifference to a medical need provides the cause of action for a lack of medical care.  As far as Plaintiff's claim could be construed as a supervisory liability claim, the constitution does not provide liability for failure to adequately supervise.  *Crawford v. Tilley*, 15 F.4th 752, 761 (6th Cir. 2021) ("[A] supervisor cannot be held liable simply because he or she was charged with overseeing a subordinate who violated the constitutional right of another.") (further citation omitted).

Even assuming a failure-to-protect claim could be applied in the medical context, as discussed earlier in this Report and Recommendation Plaintiff has

failed to prove that he can satisfy the objective prong required for deliberate indifference. The same analysis would presumably govern here. In any event, Plaintiff has failed to state a failure-to-protect claim.

As to Defendant Corizon, the Wellpath Defendants note that Wellpath is the entity contracted to provide medical services to Washtenaw County Jail, not Corizon. (ECF No. 183, PageID.3065). In § 1983 proceedings the plaintiff must make a clear showing that the defendant was personally involved in the activity that forms the basis of the complaint. *See Rizzo v. Goode*, 423 U.S. 362, 377 (1976); *Bellamy v. Bradley*, 729 F.2d 416, 421 (6th Cir. 1984). The undersigned suggests that Defendant Corizon should be dismissed because the undisputed facts here do not support a reasonable inference that Corizon could be liable for any of the alleged misconduct.

As to any John and Dana Doe Defendants, the undersigned suggests that these Defendants should be dismissed for the reasons discussed in this report.

## VI.    Recommendation

For the reasons set forth above, the undersigned **RECOMMENDS** that the Defendants' motion for summary judgment (ECF No. 183) be **GRANTED** and the Wellpath Defendants be **DISMISSED.** The undersigned further **RECOMMENDS** that the failure-to-protect claim against the Defendant Holmes be **DISMISSED** pursuant to screening the amended complaint and Corizon and

John and Dana Doe be **DISMISSED**. No claims remain in this matter.

The parties to this action may object to and seek review of this Report and Recommendation but are required to file any objections within 14 days of service, as provided for in Federal Rule of Civil Procedure 72(b)(2) and Local Rule 72.1(d). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health and Hum. Servs.*, 932 F.2d 505 (6th Cir. 1981). Filing objections that raise some issues but fail to raise others with specificity will not preserve all the objections a party might have to this Report and Recommendation. *Willis v. Sec'y of Health and Hum. Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Loc. 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to Local Rule 72.1(d)(2), any objections must be served on this Magistrate Judge.

Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc. Any objection must recite precisely the provision of this Report and Recommendation to which it pertains. Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity. Fed. R. Civ. P. 72(b)(2), Local Rule 72.1(d). The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," etc. If the Court determines that any objections are without merit, it may

rule without awaiting the response.

Date:  October 12, 2023                    s/Curtis Ivy, Jr.
                                           Curtis Ivy, Jr.
                                           United States Magistrate Judge

## **CERTIFICATE OF SERVICE**

I hereby certify that a copy of the foregoing document was served upon the parties and/or counsel of record on October 12, 2023, by electronic means and/or ordinary mail.

                                           s/Sara Krause
                                           Case Manager
                                           (810) 341-7850